## MURPHEY *v.* TOWNSHIP OF LEE.

1. HIGHWAYS AND STREETS—MERE USER DOES NOT MAKE STRIP OF LAND PUBLIC HIGHWAY.

    The mere fact that a portion of the public traveled along a strip of land for many years to its dead end for the purpose of passing from there by a short cut over private property to reach a public highway, does not, standing alone, make said strip a public highway.

2. SAME—USER MUST BE ACCOMPANIED BY HOSTILE ACT ON PART OF TOWNSHIP.

    The use required by the statute to make a way a public highway is one accompanied by some act on the part of the township authorities, open, notorious, and hostile to the private ownership, which gives the original owner notice that his title is denied.

3. DEEDS — PRESUMPTION OF DELIVERY ARISING FROM RECORDING REBUTTABLE.

    The presumption arising from the recording of a duly executed deed that it was delivered to the grantee is rebuttable, and may be negatived by proof to the contrary.

4. SAME — DELIVERY OF DEED — PRESUMPTION OF DELIVERY REBUTTED.

    Evidence that a deed of a strip of land to a township for a highway was not delivered to the grantee until 20 years after its execution and 15 years after the death of the grantor, *held*, to rebut the presumption of delivery arising from the fact that it was recorded soon after its execution.

5. DEDICATION—ACCEPTANCE MUST BE BY HIGHWAY COMMISSIONER OR TOWN BOARD.

    Acceptance of dedication of a highway must be by the highway commissioner or the town board, either through act or word, and the tax assessor has no authority to accept dedication.

[1]Highways, 29 C. J. § 9; [2]Id., 29 C. J. §§ 9, 11; 13 R. C. L. 33; 5 R. C. L. Supp. 684; 6 R. C. L. Supp. 748; [3]Deeds, 18 C. J. § 497; [4]Id., 18 C. J. § 497; [5]Dedication, 18 C. J. §§ 79, 80.

6. Same — Inclusion or Omission From Tax Rolls of Small
   Probative Value as to Whether Strip a Highway.
   The tax assessor's inclusion or omission from the tax
       rolls of a strip of land is of small probative value on the
       issue as to whether or not said strip had been dedicated
       and accepted as a public highway.

Appeal from Allegan; Cross (Orien S.), J.    Submitted April 8, 1926.    (Docket No. 8.)    Decided July 29, 1927.

Bill by Charles L. Murphey against the township of Lee and another to enjoin a trespass upon land.    From a decree for plaintiff, defendants appeal.    Affirmed.

*Charles Thew,* for plaintiff.

*Clare E. Hoffman,* for defendants.

Steere, J.   On August 18, 1902, Stephen Murphey (plaintiff's father) executed and acknowledged a deed which by its terms conveyed to defendant township of Lee, Allegan county,

"A right of way thirty (30) feet wide off from the south side of the northeast fractional quarter of the northeast fractional quarter of section thirty-five (35), in town one north, of range fifteen (15) west.    This land is to be used for highway purposes."

The stated consideration was $1, receipt of which was acknowledged.    The instrument was recorded in the office of the register of deeds for Allegan county on September 24, 1902.    This fractional quarter of a quarter section is bounded on the west by the east shore of Osterhout lake, and on the east by a north and south highway.    The strip 30 feet wide as described in the deed extends from that north and south highway west, along the south side of this so-called fractional quarter or "40" to the lake.    Stephen

_____
*Dedication, 18 C. J. § 107.

Murphey owned and lived upon this fractional 40 from 1889 until he died intestate in 1907, excepting four irregularly sized and shaped lake front lots which he sold out of its southwest portion before he died.   His estate was probated and that' part of the probate court's order assigning residue which described the real estate was put in evidence without objection. Counsel read from it into this record a somewhat lengthy description which included this fractional 40 with the exception of the adjoining lots on the lake shore at the southwest corner, described at length by metes and bounds, and a 30-foot right of way commencing at the southeast corner of the northernmost lake front lot which had been sold, running thence southerly along the east lines of the other lake front lots sold to the south line of the fractional 40 in question here "for the use and accommodation of the lots thereon on the west side."

On July 31, 1909, the heirs of Stephen Murphey deeded to plaintiff certain described parcels of land including the fractional 40 in question, with exceptions as noted above, as we construe it, though there is some controversy over the import of the description of the 30-foot right of way.   This deed was properly recorded on October 29, 1909.   After Stephen Murphey's death, the premises were idle until 1910, when plaintiff moved upon and took possession of the place, where he has since resided and cultivated the tillable portion.

On December 9, 1922, plaintiff filed this bill of complaint alleging that he was the owner of the 30-foot strip along the south side of that fractional 40, that recently defendants had threatened to take possession of and open a public highway along it without having taken any steps to establish a right thereto by condemnation or otherwise, and to that end had made a survey of the same followed by an appropriation and ordering work commenced; that since 1889 plaintiff

and his father before him had been in continual possession of said strip of land, and cultivated the same in various ways, having thereon a valuable row of fruit trees, and asking an injunction to restrain defendants from trespassing upon said property. Defendants answered in denial, alleging said strip was deeded to it for highway purposes in 1902, had since been held by it, kept open and used regularly as a public highway for more than 10 years. The case was submitted on pleadings and proofs taken in open court. All proofs offered appear to have been admitted subject to any objections made. The views of the trial court on the various issues of law and fact involved are only disclosed in gross by a short formal decree granting the relief asked, with a recital that "it appears to the court that the material facts alleged in the bill of complaint are true and that the defense set up by the answer of defendants has not been sustained."

Beyond those already stated, the "material facts" claimed by the respective parties rest mainly in parol. On the proofs as claimed for plaintiff, it is contended the deed in question of this right of way was never delivered by the grantor, plaintiff's father, but when offered by him to defendant's township board was refused; that on its refusal he acquiesced, withdrew the offer and remained in possession of the property, cultivating and using the same as his own during the remainder of his life, as has plaintiff since then; and not until the expiration of 20 years from the time of executing it was this deed delivered to defendant, by a stranger to the title in no way representing the grantor or plaintiff as agent or otherwise; that during the intervening years there was no general public user of the strip for a highway, except as the owner permitted others to use a private roadway left along its south side for convenience of owners of lake shore lots sold by plaintiff's father; that, during the intervening 20 years, the defendant township never assumed to

accept, take possession of, make improvements upon or in any way recognize this strip as a public highway, and no proceedings of any kind were ever taken by defendants so assuming it to be until shortly before this suit was begun.

On the part of defendants numerous questions of fact and law are raised and argued. On the question of acceptance, it is contended that when a conveyance is made to a municipality and recorded by the grantor or his representative, acceptance is implied without having been formally made; and that acceptance was indicated in this instance by that strip having since been exempted from taxation; the proofs show the owner of this property, after executing and recording a deed of it to the township for a highway, left it open with a driveway along it, which has since been free for public travel and in regular use by the public as a highway; without protest or objection on the part of plaintiff or his predecessor up to shortly before the time of the commencement of this suit.

Explanatory of Stephen Murphey's execution of this deed of a 30-foot right of way, it was shown that in 1892 he had sold to a Mrs. Nelson some land in section 36 lying just across the north and south highway on the east side of this fractional 40. A Chicago attorney named Knap represented Mrs. Nelson in the transaction. He interested Murphey in a project to plat some of the Nelson and Murphey lands, with a view to selling resort lots to Chicago resorters and grant a roadway for them down to the lake shore, which, with Murphey as local representative, they anticipated would prove a profitable venture. I. E. Evans, then and for years before supervisor of Lee township, testified to their discussing this "scheme" with him personally and before the township board, saying in part:

"They were going to sell those lots to Chicago people, and their idea was that they would come over there and build cottages, and Mr. Knap said that they must

be sure they had a right of way to the lake in order to induce them to buy these lots, and that was what led up to the issuing of this deed for this strip of land.

"*Q.* At that time was there any path or driveway at all down that 30 feet?

"*A.* Not that I know of.

"*Q.* Where did they go to the lake?

"*A.* Well, Murphey had a driveway north of his buildings, north of his house and barn, that went down to the lake and went down all a good sandy shore along back there; he used to allow people to go down there to go fishing or bathing. * * * I have been on Murphey's place a great many times. * * * Mr. Knap wanted the deed to show those people that they could get to the lake because the lake was the whole thing to those Chicago prospects. * * * There was talk about the township accepting this road proposition; they wanted a road to the lake. * * * This was discussed on the township board, as I stated a few minutes ago, it was talked over; if you want the proposition that the township board made, I will give it to you.

"*Q.* First I want to dispose of this, what they told Murphey or Knap about this.

"*A.* Well, they told Murphey that they didn't consider this a suitable location for the road owing to the fact of the condition of the landing, that it wouldn't be of any particular public benefit, and for that reason the town refused to spend any money on this line. * * * We made the proposition that we would open the road on the north end of the Murphey place and on the south end of the John Burnett place, that would be on the section line, running right straight west from the section line road that is now open to the lake, that the town would appropriate some money to open that road."

Evans was supervisor until 1904, and testified he did not remember ever seeing this deed, which had been discussed with him personally and at the township board meeting, but that there never was any deed submitted to the board while he was there. This deed, dated August 18, 1902, was filed with the township clerk of Lee township by Mrs. Nelson's son on De-

cember 7, 1922. It was acknowledged before and witnessed by Lyman S. Monroe, a banker of South Haven. Aside from other indorsements there was written on the back of this deed: "Mail to Otto Knap, 300 Grand Ave., Chicago, Ill."

The township records fail to show any action ever taken by its township board in regard to this matter. Its clerk who had the records testified:

"I have not found a record of anything about this road prior to 1922."

The immediate events leading up to this litigation are thus stated by defendant Burch:

"There is a steep incline at the west end of the 30-foot strip. At the bottom I wouldn't call it marshy, it is level, flat. The board instructed me to fix the road for public travel. I estimated it would cost $50. That is what the board voted to spend on it when Mr. Murphey stopped me."

After his scheme with Knap of platting lots to sell Chicago resorters fell through in 1902, Stephen Murphey deeded a lot of considerable size in the southwest corner of this fractional 40 to one Johnson, covering the west end of the 30-foot strip. This deed was dated November 12, 1902, and recorded. On June 12, 1903, Johnson deeded the lot back to Murphey, the deed being also recorded. In 1906 Murphey sold four lake shore lots at the southwest corner of the property. The lot farthest south along the lake shore was sold to a man named Fisher and covered a portion of the lot previously deeded by Murphey to Johnson. This lot was described by metes and bounds and covered over ten rods in length of the west end of the 30-foot strip. To the description of the lot was added:

"And for right of way only for benefit of property herein conveyed 30 feet in width across the south side of the 40 acres above described."

Soon after this lot was sold the purchaser made im-

provements and built a house upon it which has been occupied during summers ever since. Fisher sold the lot to one Slittler who sold it to one Habick and it is spoken of by witnesses as the "Habick lot."

No claim is made of any driveway or public travel to the lake over the Habick lot, and when a witness for the defense named Homer Evans testified he did not remember ever seeing anybody cross the Habick lot to the lake, and "There was no driveway or roadway through that lot," defendants' counsel said:

"The court understands we don't claim that last ten rods?

"*The Court:* No, I don't understand.    *    *    *
Now, what is your statement?

"*Mr. H——:* We don't claim that this main traveled track which ran east and west as far as Habick's corner, that followed down to the lake that last ten rods."

As to the opening and use of a road along this strip, plaintiff testified that there had never been any roadway or travel along there until his father sold the lake shore lots in 1906, after which he opened and left clear a private driveway next to the fence along the south line of this fractional 40 for the use of the shore owners to whom he had sold lots with right of way, but otherwise he retained possession of the 30-foot strip as before, cultivated it outside the traveled track, raised on it small fruits such as strawberries, currants and raspberries, and planted a row of plum trees close to and along the driveway three years before he died. Since taking possession of the property in 1910, plaintiff has continued to cultivate the strip outside of the worn way, raising vegetables and small fruits, has cared for, pruned and sprayed the row of plum trees his father planted, replacing some that were missing and extended the row. No one questioned their right to do so. After he went there in 1910 plaintiff put up a sign on the driveway marked "Private Road,"

owing, as he said, to the increased travel coming along there and the fact that strangers mistook it for an east and west highway farther south on the section line which led west from the north and south highway east of his place toward Grand Junction, while others who knew they could get through frequently traveled down the private way to make a short cut across from the north and south to the east and west road.     The latter was reached by a private way from where the strip in question ended at the Habick lot, going thence through an opening in plaintiff's stump fence and southerly across other private property to the east and west section line road south of the lake.     This sign, with intermissions when it happened to fall or be knocked down, had been maintained practically ever since he moved upon the property.

It is undisputed that there was more or less travel through that way by people who had learned the short cut, with which neither plaintiff nor his father interfered, but sometimes directed people who inquired how they could get through there.     Plaintiff testified to having at one time opened his fence so that he as well as others could get through that way.

John Burkhead, an old resident in that locality, who was called as a witness by defendants, said he had driven that cross road frequently, that it looked as though it was traveled almost as much as the north and south road, and described it as follows:

"After we got to the end of this road (along the 30-foot strip) we came to a fence.     There was an opening in the fence, then we drove across lot to the south to the other road about 80 rods.     We had to cross another man's land.     I have been right through that fence in the last six years.     I remember going across twice.     The last time was summer before last."

Homer Evans, the township treasurer at the time of the trial and called as a witness by defendants, testified he lived at the northeast end of Osterhout lake

and had been familiar with conditions around the lake for many years. He had not been over this cross cut road every year but a good many times, saying in part:

"It has always been open. Anybody could go down to it. The first time I ever heard of any objection to any one traveling on this road of the south of the Murphey land, was when I was with the town board a year ago last summer, the day this deed was brought in by Westermark and Nelson. * * * That has been cultivated up to within a short distance of this track. * * * The way I got to travel this road instead of going around this way and turning the corner, I used to travel down to the Habick lot, and then they had a road across field there for a year or maybe two. We used to go that way to Grand Junction. * * * There was a road across this 40 acres that joined Murphey on the south. I forget whether any one lived there or not. They used to travel this road quite a lot because the other road was pretty sandy in places and at that time the main travel went down that road. No one said anything about it. The road was used that way a year or two. I drawed pickles over it a good many times I know. Then they fixed up the other road on the east side (that is the north and south road) so that the travel went that way."

While the testimony is at variance as to how regularly and to what extent that cross way was traveled, the fact is undisputed that it was used by those so desiring to the extent of making a traveled track through there.

The mere fact that a portion of the public traveled along this strip for many years to its dead end at the Habick lot for the purpose of passing from there by a short cut over private property to reach a public highway connecting with the north and south highway they had left or were traveling toward, does not, standing alone, make it a public highway.

"The use required by the statute is one accompanied

by some act on the part of the township authorities open, notorious, and hostile to the private ownership; some act which gives the original owner notice that his title is denied." *Stickley* v. *Township of Sodus,* 131 Mich. 510, 517 (59 L. R. A. 287).

In *Chapman* v. *City of Sault Ste. Marie,* 146 Mich. 23, 29, this court said the trial judge correctly instructed the jury:

"That 'not only the general public must use it and travel upon it as a thoroughfare, but the implied dedication must be accepted by the public authorities, and the way taken in charge and maintained as other highways.' *Alton* v. *Meeuwenberg,* 108 Mich. 629; *Irving* v. *Ford,* 65 Mich. 241; *Harriman* v. *Howe,* 78 Hun (N. Y.), 280, 155 N. Y. 683 (50 N. E. 1117).

"Important consequences flow from the acceptance of a highway by the public authorities, and the rule is a salutary one which requires that mere user by individuals shall not render the corporate body liable for such consequences."

In *South Branch Ranch Co.* v. *Emery,* 191 Mich. 188, where it was claimed that public travel upon a driveway for ten years had established it as a public highway under the ten-year statute of limitations, it was held, although it was shown there had been such travel, it did not appear that the road was accepted by any unequivocal act of the authorities within the ten-year period, as by improving or exercising control over it, and therefore did not become a highway by adverse user within the meaning of the statute.

While it is the rule, as defendants contend, that where a duly executed deed is recorded a presumption arises it was delivered to the grantee, such presumption is not irrebuttable and may be negatived by proof to the contrary. The evidence in this case to the contrary is persuasive that Nelson's Chicago attorney, Knap, caused Murphey's right of way deed of 1902 to be recorded in furtherance of their abortive scheme to plat property for sale of lots to Chicago resorters, and

after being recorded it was mailed to him at Chicago, from where it some time later reached the hands of Mrs. Nelson's son, who, 20 years after it was executed and 15 years after the grantor died, delivered it to defendant township. It was not during the grantor's life time delivered by him to the grantee in person or by agent, and if any agency existed it ended with the grantor's death.

Upon these issues the claimed exemption from taxation is of scant significance. Whatever was done in that connection was by the tax assessor in preparing his assessment roll, not by the highway commissioner, or the town board. Acceptance must be by them either through act or word. The assessor had no authority to accept dedication for the public. After Stephen Murphey sold those shore lots out of this fractional 40 in 1906 the assessor apparently continued to assess it to him by the same description as a fractional 40 excepting therefrom the portion sold out of it and attempting to follow in his exception those descriptions with which ran rights of way apparently leading to some lack of clarity, as to which counsel do not agree. Prior to 1907 no exception of any kind was made on the tax roll from the description of this fractional 40. On the roll for 1907 and following years as read into this record by defendants' witness Thomas, the description is as follows:

"The south half of the northeast fractional quarter of northeast quarter. Except the parcel commencing sixty-six feet east of the southwest corner and extending east four hundred feet, north one hundred eighty-three feet, west to lake; southwest and south to beginning, and thirty feet from the south side."

Of this Thomas said: "That 30 feet is this right of way." Defendants' counsel so contends.

Plaintiff's counsel urges that was manifestly taken from and follows in description the exact language of the Fisher deed to the Habick lot, and shows the there

described 30-foot right of way along the south side of the 40 was "only for benefit of property herein conveyed." But be that as it may, only an easement is involved, the fee was never conveyed by Murphey to any one. No acreage or valuation for taxation is shown and the inclusion or omission from the tax roll by the assessor of this strip is of small probative value for or against either party. *Schmitt* v. *San Francisco*, 100 Cal. 302 (34 Pac. 961); *Campau* v. *City of Detroit*, 104 Mich. 560; *Arnold* v. *City of Orange*, 73 N. J. Eq. 280 (66 Atl. 1052).

The decree appealed from will stand affirmed, with costs to plaintiff.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.